813 P.2d 880

**Curtis GRANT and Robert Grant, Plaintiffs–Appellants,**

v.

**CITY OF TWIN FALLS, Defendant,**

**and**

**Ronald E. Axtman and K.A. McDowell, Defendants–Respondents.**

No. 17976.

Supreme Court of Idaho, Boise, November 1989 Term.

June 26, 1991.

Lojek & Gabbert, Boise, for plaintiffs-appellants. Donald W. Lojek, argued.

Benoit, Alexander, Sinclair, Doerr, Harwood & High, Twin Falls, for defendants-respondents. Fritz A. Wonderlich, argued.

BISTLINE, Justice.

On August 21, 1982, Curtis and Robert Grant were involved in an altercation at the Windbreak Bar in Twin Falls. The bar's bouncer executed a citizen's arrest of the two brothers. The police were called and the brothers were taken into custody. The manner in which that was done is disputed. The brothers allege that the officers provoked a confrontation; the police disagree.

What happened at the police station is also a matter of dispute. All parties agree, however, that somehow the Grant brothers and Officer Axtman ended up alone in a room. Axtman maintains that the brothers took this opportunity to assault him; the

brothers assert that Officer Axtman used the time to push them around. Other officers ultimately entered the room, the fight was broken off, and the brothers placed in separate cells until the booking procedure was completed. Sometime during the course of these events Curtis Grant's jaw was broken in three places and Robert Grant was "bruised and bloodied."

Curtis and Robert Grant filed a complaint in this action on August 21, 1984. The complaint issued on January 3, 1986. The trial court dismissed the action for failure to prosecute. That dismissal was reversed by the Court of Appeals and the cause was remanded for trial. *Grant v. City of Twin Falls*, 113 Idaho 604, 746 P.2d 1063 (Ct.App.1987). A jury trial commenced on December 13, 1988. During the trial, stipulations were entered dismissing the claims against the City of Twin Falls and the punitive damages claim against the officers.

The instructions to the jury included the following:

### INSTRUCTION NO. 15

In determining whether the constitutional line between proper and improper use of force has been crossed, you should consider such facts as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether force was applied in good faith effort to maintain or restore discipline or maliciously or sadistically *for the very purpose of causing* harm.

On December 16, 1988, the jury entered special verdicts in favor of the officers. The Grants appealed from the judgments entered on those verdicts.

After trial, but before oral argument was heard before this Court, the United States Supreme Court decided *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In *Graham* the Court held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the fourth amendment and its 'reasonableness' standard, rather than under a 'substantive due process' [fourteenth amendment] approach." 109 S.Ct. at 1871 (emphasis in original). The *Graham* court went on to say that a test

> which requires consideration of whether the individual officers acted in 'good faith' or 'maliciously and sadistically for the very purpose of causing harm,' is incompatible with a proper Fourth Amendment analysis.... The Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances, and subjective concepts like 'malice' and 'sadism' have no proper place in that inquiry.

*Graham*, 109 S.Ct. at 1872–73 (citations and footnote omitted). However, the *Graham* court also limited the scope of its ruling, stating that

> [o]ur cases have not resolved the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins, and we do not attempt to answer that question today. It is clear, however, that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.

*Graham*, 109 S.Ct. at 1871 n. 10 (citations omitted).

Thus the following issues are before us on appeal:

(1) Whether *Graham v. Connor* should be applied retroactively;

(2) if *Graham v. Connor* does apply retroactively, whether the Grants were arrestees meriting Fourth Amendment jury instructions, or pretrial detainees, in which case the instructions given at trial were appropriate; and

(3) whether the Grants were entitled to a new trial on their negligence claims authorized by the Idaho Tort Claims Act.

We will address each issue in turn.

## I. RETROACTIVE APPLICATION OF *GRAHAM v. CONNOR*

■ "The general rule ... is that an appellate court must apply the law in effect at the time it renders its decision." *Thorpe v. Housing Auth.*, 393 U.S. 268, 281, 89 S.Ct. 518, 526, 21 L.Ed.2d 474 (1969); *see also Ziffrin, Inc. v. United States*, 318 U.S. 73, 78, 63 S.Ct. 465, 469, 87 L.Ed. 621 (1943); *Austin v. City of Bisbee*, 855 F.2d 1429 (9th Cir.1988). Thus, "ordinarily a decision reformulating federal civil law will be applied retroactively." *Reed v. Hoy*, 891 F.2d 1421 (9th Cir.1989); *Austin*, 855 F.2d 1429.

However, there are some cases in which "application of this retroactivity precept produces inequitable results, penalizing parties who ordered their affairs in reasonable reliance on a rule of law that was later invalidated." *Mineo v. Port Auth.*, 779 F.2d 939, 943 (3d Cir.1985), *reh'g denied en banc*, 783 F.2d 42 (3d Cir.), *cert. denied*, 478 U.S. 1005, 106 S.Ct. 3297, 92 L.Ed.2d 712 (1986). In such cases, a decision reformulating federal civil law will be applied prospectively only if the decision satisfies the three factors set forth in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). Those factors are: (1) Whether "the decision to be applied nonretroactively ... establish[es] a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed"; (2) whether, in light of "the prior history of the rule in question, [and] its purpose and effect, ... retroactive operation will further or retard its operation"; and (3) whether the decision "could produce substantial inequitable results if applied retroactively." *Chevron Oil*, 404 U.S. at 106–07, 92 S.Ct. at 355 (citations omitted).

The Ninth Circuit Court of Appeals recently had occasion to apply the three factors of *Chevron* to the question of whether *Graham* should be applied retroactively. *Reed v. Hoy*, 891 F.2d 1421 (9th Cir.1989). The *Reed* court stated:

*Graham* clearly overrules past Ninth Circuit precedent. *See, e.g., Rinker* [*v.*

*Napa County* ], 831 F.2d [829] at 831–32 [9th Cir.1987]. However, the Supreme Court stated in *Graham:*

Today we make explicit what was implicit in *Garner's* analysis and hold that *all* claims that law enforcement officers have used excessive force— deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard....

*Graham*, 109 S.Ct. at 1871 (*citing Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). Thus, the Supreme Court does not view its decision as establishing a new principle of law.

In addition, retroactive application will further, not retard, the policies embodied in *Graham*. *Graham's* application of an objective reasonableness standard furthers the essential purposes of the fourth amendment—guaranteeing that free citizens are ' "secure in their persons ... against *unreasonable* ... seizures" of the person.' *Graham*, 109 S.Ct. at 1871 (emphasis added). Conditioning liability for the use of excessive force upon a showing that the force was intentional, unprovoked and brutal would frustrate rather than further the purposes of the fourth amendment and the *Graham* rule.

Finally, retroactive application will impose no substantial inequities. The paradigm case in which we have found 'substantial inequitable results' is one in which the new rule consists of a shortened statute of limitations. *See, e.g., Gibson v. United States*, 781 F.2d 1334, 1339–40 (9th Cir.1986), *cert. denied*, 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987); *Barina v. Gulf Trading & Transp. Co.*, 726 F.2d 560, 562–64 (9th Cir.1984). In such cases, retroactive application of the new rule would violate a party's reasonable expectations upon which the timing of its filing was based and act to bar potentially valid civil claims. Similarly, in *Austin*, 855 F.2d at 1433–34, we held that the rule of *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), extending the protection of

the Fair Labor Standards Act (FLSA) to all state and local government employees, should not be applied retroactively. In *Austin,* as in other retroactivity cases, the key to finding 'substantial inequitable results' is a party's reasonable reliance on a rule of law that was later invalidated. *Austin,* at 885 F.2d 1433 ('A retroactive application of *Garcia* would punish the City of Bisbee for structuring its employment contracts according to the "clear past precedent" that was controlling when the contracts were entered into.').

The concerns underlying our decisions in *Gibson, Barina,* and *Austin* are not present in this case. It is extremely unlikely that the conduct of Hoy or of Douglas County was influenced in any way by concerns about whether or not any potential civil liability for law enforcement officials' use of force against citizens is evaluated under the standards set out in *Rinker.*

*Reed,* 891 F.2d at 1425.

We find this application of *Chevron* to the issue of *Graham's* retroactivity to be well-reasoned and sound. We therefore hold that the standard enunciated in *Graham* should be retroactively applied to cases such as this one which were pending at the time *Graham* was announced.[1]

## II. WHETHER THE GRANTS WERE PRETRIAL DETAINEES

■ The *Graham* court stated that "[o]ur cases have not resolved the question whether the fourth amendment continues to provide individuals with protection against the deliberate use of excessive force beyond the point at which arrest ends

and pretrial detention begins." *Graham,* 109 S.Ct. at 1871 n. 10. Unfortunately, the Court did not provide any guidance in determining *when* arrest ends and pretrial detention begins.

However, we need not make that determination in a vacuum, given the decisions of other courts which have grappled with the question in the wake of *Graham.* In *Jones v. County of DuPage,* 700 F.Supp. 965, 970–72 (N.D.Ill.1988), the federal district court was confronted with the question of whether a defendant who had been arrested without a warrant and jailed was an arrestee or a pretrial detainee for the purpose of fourth amendment analysis. That court reasoned that:

Although defining the precise moment at which a seizure ends and detention begins will not always be an easy task, there is a line of authority in Fourth Amendment case law strongly suggesting that, in the case of warrantless arrests, a fixed rule can be established. As noted above, the Supreme Court held in *Gerstein* [*v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)] that when the police make a warrantless arrest the Fourth Amendment requires them to bring the arrestee before a judicial officer for a probable cause determination within a reasonable period of time. 420 U.S. at 125, 95 S.Ct. at 868. Semantically *Gerstein* can be read to mean either that the Fourth Amendment reasonableness test applies not only to 'arrests' but also, in these cases, to 'detentions,' *Fisher v. Washington Metro. Area Transit Authority,* 690 F.2d [1133] at 1140 [4th Cir.1982], or, alternatively, that the 'arrest' does not become a 'detention' until

1. A number of other federal appellate courts have also held that *Graham* applies retroactively, although none have furnished an in-depth analysis of the retroactivity issue comparable to that in *Reed. See, e.g., Miller v. Lovett,* 879 F.2d 1066, 1069–70 (2d Cir.1989) ("[i]n light of *Graham,* it was plain error to charge the jury under the old *Johnson v. Glick* [481 F.2d 1028 (2nd Cir.1973)] standard for evaluating excessive force claims, and we reverse 'without considering whether the appropriate objections were made below'"); *Calamia v. City of New York,* 879 F.2d 1025, 1034–35 (2d Cir.1989)

("[w]e conclude that, in light of the Supreme Court's recent clarification in *Graham v. Connor* . . ., neither the instructions requested by Sutton nor those given by the trial court were entirely correct"); *Johnson v. Morel,* 876 F.2d 477 (5th Cir.1989). *See also Fonte v. Collins,* 718 F.Supp. 1 (D.Me.1989) (vacating summary judgment in light of *Graham* ); *Felder v. Casey,* 150 Wis.2d 458, 441 N.W.2d 725, 731 n. 9 (1989) (the holding in *Graham* was foreshadowed in *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) and was urged by other courts and by scholars).

the judicial officer finds probable cause to hold.

One thing, however, is clear: The Fourth Amendment's prohibition against unreasonable 'seizures' applies, at least with respect to the duration of the seizure, until the individual is taken before a judicial official, *see Gramenos v. Jewel Companies*, 797 F.2d 432, 437 (7th Cir. 1986); *Bergren v. City of Milwaukee*, 811 F.2d 1139, 1143 (7th Cir.1987), and does so irrespective of whether the individual remains in the custody of the arresting officers throughout the time prior to his appearance. *Fisher v. Washington Metro. Area Transit Authority*, 690 F.2d at 1141, n. 11. This court can see no reason for applying the Fourth Amendment differently in cases where the person challenges, not merely the duration of the seizure, but the conditions as well. *See Fisher v. Washington Metro. Area Transit Authority*, 690 F.2d at 1141 n. 11 (conditions of confinement remain subject to Fourth Amendment strictures until the individual receives a judicial determination of probable cause), *discussed with approval, Moore v. Marketplace Restaurants, Inc.*, 754 F.2d 1336, 1350–51, 1351–52 (7th Cir. 1985). *Compare Justice v. Dennis*, 834 F.2d 380 (4th Cir.1987) (affirming trial court's 'shocks the conscience' instruction in case involving alleged excessive force following a magistrate's determination of probable cause).

. . . .

Precedent aside, there are good reasons for holding government officials to the Fourth Amendment's reasonableness standard until a judicial determination of probable cause has been obtained. An individual arrested without a warrant is in a uniquely vulnerable position. Not only has he been arrested based solely on the probable cause determination of police officials, but, as far as he knows, only the police know his whereabouts. Whatever fear and distress he might feel on account of his having been arrested at all might remain magnified until he comes before a judicial officer.

Furthermore, the emotions of government officials are likely to be at their highest in the period following a warrantless arrest. Unlike an arrest pursuant to a warrant, the warrantless arrest places on the police officials the sole responsibility for the propriety of their conduct. *United States v. Ross*, 456 U.S. 798, 823 n. 32, 102 S.Ct. 2157, 2172 n. 32, 72 L.Ed.2d 572 (1982) ('[I]n choosing to search without a warrant on their own assessment of probable cause, police officers of course lose the protection that a warrant would provide to them in an action for damages brought by an individual claiming that the search was unconstitutional.') This added tension renders the arrested individual even more vulnerable to the overzealousness of officials seeking evidence to vindicate their action. Accordingly, this court finds that an individual arrested without a warrant remains an arrestee for the purposes of *Lester's* Fourth Amendment analysis until he is brought before a judicial officer for a probable cause determination.

*Jones*, 700 F.Supp. at 970–71.

One year later the same federal district court had before it potentially conflicting case law on the arrestee/detainee issue: *Graham, Wilkins v. May*, 872 F.2d 190 (7th Cir.1989), and its own *Jones* opinion. The court resolved the conflict as follows:

In other words, *Graham* and *Wilkins* agree that the Fourth Amendment applies until the initial seizure comes to an end, but *Graham* seems to hold, contrary to *Wilkins*, that when the police beat an individual senseless after gaining control over (initially seizing) him, the Fourth Amendment still can provide the appropriate framework for assessing the lawfulness of their conduct. *Graham* thus appears to undercut *Wilkins's* view that a seizure ends at the moment the police gain custody and control over the suspect.

If the seizure does not end then, then when does it end? Without its 'custody' rationale, *Wilkins* leaves us with a holding that a seizure is over by the time custodial interrogation begins, but no principled basis for reaching this result.

In *Jones v. County of DuPage,* 700 F.Supp. 965 (N.D.Ill.1988), decided after *Lester* [*v. City of Chicago,* 830 F.2d 706 (7th Cir.1987)] but before *Wilkins* and *Graham,* this court ruled that, at least in the case of a warrantless arrest, 'seizure ends and detention begins' when the police bring the arrestee before a judicial officer for a probable cause determination. *Id.* at 970. Analogies from other areas of Fourth Amendment law suggested this division, *see Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), and practical concerns supported imposing a higher standard of care on officers until such time as they receive judicial approval for their seizures. *See* 700 F.Supp. at 970–71. Without citing *Jones, Wilkins* rejected the analysis. Its reasons for doing so, however, prove significant.

*Gerstein* had held that 'the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest.' 420 U.S. at 114, 95 S.Ct. at 863. *Jones* found *Gerstein* instructive in determining the time at which a seizure comes to an end, reasoning that *Gerstein's* ruling that a state may not subject a person to pretrial detention without a judicial determination of probable cause supports the view that a seizure does not become a detention until such a determination is obtained. 700 F.Supp. at 970. *Wilkins* acknowledged an analogy between *Gerstein* and the question of when a seizure ends in an excessive force case, 872 F.2d at 193, but pointed out that because *Gerstein* involved an interpretation of the Fourth Amendment's requirement of probable cause, rather than its Reasonableness Clause, it did not necessarily control in the excessive force context. *Id.*

*Jones,* too, recognized that *Gerstein* served only as an analogy, not a precedent. 700 F.Supp. at 970. Turning to practical considerations, *Jones* then determined that an individual's enhanced vulnerability, and an officer's higher emotional state, prior to an individual's appearance before a magistrate favored applying the strong protections of the Fourth Amendment until such time. *Id.* at 971. As noted earlier, *Wilkins* viewed the practical considerations very differently. According to *Wilkins,* the fact that even minimal force against a person once he is in custody could be called unreasonable renders the Fourth Amendment reasonableness standard too severe after this point. 872 F.2d at 193–94. The Court thus rejected the *Gerstein* analogy.

*Graham* made no mention of *Gerstein,* but its willingness to apply the Fourth Amendment standard to the officers' use of force after they had the plaintiff securely in custody, indeed its specific rejection of the notion that such a standard would turn every 'push and shove' into a constitutional violation (109 S.Ct. at 1872), weakens *Wilkins's* criticism of the *Jones* approach. In light of this, *Wilkins* does not stand as an obstacle to employing *Jones's* line of demarcation between seizure and detention, and hence between Fourth Amendment and Fourteenth Amendment scrutiny. *Cf. LeVick v. Skaggs Companies, Inc.,* 701 F.2d 777, 778 (9th Cir.1983). Unless the Seventh Circuit rules otherwise, this court will adhere to that ruling.

*Henson v. Thezan,* 717 F.Supp. 1330, 1335–36 (N.D.Ill.1989) (footnotes omitted). The Second Circuit Court of Appeals has also endorsed arraignment as the proper line of demarcation between arrest and pretrial detention. *See Powell v. Gardner,* 891 F.2d 1039, 1044 (2d Cir.1989); *see also Hammer v. Gross,* 884 F.2d 1200 (9th Cir. 1989) (*Graham* controls in case in which DUI arrestee was forceably restrained by officers for purpose of drawing blood); *cf. Titran v. Ackman,* 893 F.2d 145, 147 (7th Cir.1990) (defendant's "presence in the jail and the completion of the booking marked the line between 'arrest' and 'detention' ").

The focus on arraignment as the break between arrest and detention makes sense both from the legal standpoint and from the standpoint of common sense. It is at the arraignment that the actions of the police in seizing the defendant are either

ratified or rejected. It is at the arraignment that a determination of probable cause or lack thereof to hold and charge the arrestee is first made. And, it is at the arraignment that the decision is made either to release or to detain the arrestee pending trial. For all of these reasons, we conclude that, for purposes of determining whether the fourth amendment or fifth amendment constitutional guarantees apply, a person is an arrestee until such time as he or she is arraigned and a probable cause determination has been made.

■ Since the Grants had not been arraigned prior to the alleged applications of excessive force, they were arrestees, entitled to the protection of the fourth amendment's objective reasonableness standard. It was therefore reversible error for the trial court to instruct the jury on the fifth amendment standard, which turns on the subjective state of mind of the officer. On retrial:

> The court must instruct the jury to determine whether the officers' use of force was objectively reasonable by balancing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the interests of the police in [treating the Grants] in the particular manner [they were treated]. *Graham*, 109 S.Ct. at 1871. The jury must also keep in mind that

> > Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

> *Graham* at 1871 (quotations and citations omitted). Thus, the jury should be instructed to give careful attention to the facts and circumstances of the case, 'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resist-

ing arrest or attempting to evade arrest by flight.' *Graham* at 1871.

*Miller v. Lovett*, 879 F.2d 1066, 1070 (2d Cir.1989).

## III. WHETHER THE GRANTS ARE ENTITLED TO A NEW TRIAL ON THEIR CLAIMS AUTHORIZED BY THE IDAHO TORT CLAIMS ACT

The Grant brothers contend that they pled negligence in their complaint, offered proof of negligence at trial, and were therefore entitled to have the jury instructed on the negligence issue. We agree, but nevertheless affirm the judgment of the trial court on this issue.

■ One problem with this case that has faced both the trial court and this Court is that neither party was overly adept at distinguishing the tort claims cognizable under the ITCA from the constitutional claims cognizable under 42 U.S.C. § 1983. Thus the pleadings of both parties, the proof offered at trial, and the jury instructions are all a jumble of the evidence and the law applicable under these two very different statutory schemes. While they may not have accomplished it artfully, however, it is clear that the Grants pled negligence in paragraph 6 of their amended complaint, and that counsel's arguments concerning reasonableness preserved the issue at trial sufficiently to merit jury instructions on negligence.

■ Despite these findings, we are compelled by recent case law announced by this Court to affirm the judgment of the trial court insofar as it concerns the gist of the Grants' claims authorized by the ITCA. The ITCA was designed to alleviate the harshness of previously existing law, which afforded governments and their employees absolute immunity from liability for wrongful acts. The Act is structured in three tiers: The general rule is that governmental entities are liable for damages arising out of their own negligent or otherwise wrongful acts and for those of their employees who were acting within the course and scope of their employment. I.C. § 6–903. Section 6–904 then sets out certain exceptions to liability, including, rele-

vant to the present discussion, an exception for acts such as battery and false imprisonment commonly known as intentional torts. The third tier is also established by I.C. § 6–904. It states that the exceptions to liability do not apply if the acts were committed with malice or criminal intent. It was this latter provision on which instructions were given at trial, and on which the jury rendered a verdict for the defendants. That verdict has not been challenged by the Grants. Their appeal instead focused on the argument that instructions should have been given concerning the first ITCA tier, that of negligence.

Our decision on this issue is governed by the Court's recent pronouncement in *White v. University of Idaho*, 118 Idaho 400, 797 P.2d 108 (1990). The *White* Court held that to commit a civil battery one need only have the intent to make physical contact with another person, not the intent to cause harm. The *White* decision engendered a strong dissent from one member of this Court. *White*, 118 Idaho at 403, 797 P.2d at 111 (Bistline, J. dissenting). Nevertheless, *White* is now Idaho case law precedent, dictating that we not send the Grants' negligence claim back for trial. The officers clearly intended to make physical contact with the Grants, and that contact resulted in harm. Under *White*, that action constitutes a battery, for which both the city and the individual officers are immune under I.C. § 6–904(3).

This interpretation of the tort actions permitted by the ITCA may appear harsh to the Grants, but the entire suit against the City of Twin Falls was voluntarily dismissed. On the other hand, neither the § 1983 claim nor the tort claim against the individual officers was dismissed. In fact, the tort claim against the officers went to trial on the theory that malice was involved. The jury found in favor of the officers on that claim, and the ITCA precludes actions for nonmalicious battery. Even though the jury was not instructed on a negligence theory, such a theory on these facts has been precluded by *White v. University of Idaho*.

## IV. CONCLUSION

The judgment of the trial court on the Grants' claims authorized by the Idaho Tort Claims Act is affirmed. The judgment as to the 42 U.S.C. § 1983 claim is vacated and the cause is remanded for proceedings consistent with this opinion.

No costs awarded, as the parties prevailed equally.

BAKES, C.J., and BOYLE and McDEVITT, JJ., concur in Parts I and II.

JOHNSON, J., concurs in Part III.

BAKES, C.J., and BOYLE and McDEVITT, JJ., concur in the result in Part III.

JOHNSON, Justice, concurring and dissenting.

I concur in part III of the Court's opinion. I dissent from parts I and II. In my view, the issues addressed in parts I and II were not preserved for appeal because although the Grants alleged negligence, this allegation was not pursued by evidence or requested instructions. Therefore, I would not address the issues discussed in parts I and II.